**SYNAGRO–WWT, INC., Plaintiff,**

v.

**RUSH TOWNSHIP, PENNSYLVANIA, Defendant.**

No. 4:CV–00–1625.

United States District Court, M.D. Pennsylvania.

June 7, 2002.

---

James B. Slaughter, David W. Wagner, Beveridge & Diamond, P.C., Washington, DC, Robert E. Thomas, Kaminsky, Thomas, Wharton & Lovette, Johnstown, PA, for Synagro-WWT, Inc.

Thomas W. Scott, Killian & Gephart, Harrisburg, PA, David J. MacMain, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, Paula J. McDermott, Killian & Gephart, Harrisburg, PA, Michael J. O'Connor, Killian & Gephart, LLP, Harrisburg, PA, for Rush Tp., Penn.

Eugene E. Dice, Buchanan Ingersoll Professional Corp., Harrisburg, PA, for Pennsylvania Septage Management Ass'n.

Thomas L. Wenger, Wix, Wenger & Weidner, Harrisburg, PA, for Pennsylvania State Ass'n of Tp. Supervisors.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

This case involves numerous federal and state challenges to the validity of a municipal ordinance. Plaintiff Synagro–WWT, Inc. (Synagro) is a company that applies sewage sludge to land sites that were formerly used for surface mining. Defendant Rush Township, Pennsylvania has enacted an ordinance (the Ordinance) that requires companies that apply sewage sludge to comply with certain procedural requirements if they wish to apply sewage sludge in Rush Township. The Ordinance also places a partial ban on the transportation of sewage sludge within the township.

Synagro filed a complaint seeking a declaratory judgment that the Ordinance is invalid, an injunction against the enforcement of the ordinance, and damages. The complaint raises the following claims: (1) the Ordinance is preempted by the federal Surface Mining Control and Reclamation Act (Count I); (2) the Ordinance is preempted by the Pennsylvania Surface Mining Conservation and Reclamation Act (Count II); (3) the Ordinance violates the Due Process Clause of the United States Constitution (Count III); (4) the Ordinance violates the Commerce Clause of the United States Constitution (Count IV); (5) the Ordinance violates the Equal Protection Clause of the United States Constitution (Count V); (6) the Ordinance violates the Uniformity Clause of the Pennsylvania Constitution (Count VI); (7) the Ordinance is preempted by three other Pennsylvania statutes: the Nutrient Management Act, the Solid Waste Management Act, and the Sewage Facilities Act (Count VII); (8) the Ordinance violates the Contract Clauses of the United States and Pennsylvania Constitutions (Count VIII); and (9) the enactment of the Ordinance was an ultra vires action (Count IX). We have both federal question and diversity jurisdiction. *See* 28 U.S.C. §§ 1331, 1332.

Before the court is a motion filed by Rush Township. Rush Township requests relief in three forms. First, it seeks dismissal under Federal Rule of Civil Procedure 12(b)(6) of every count of the complaint. Second, it asks the court to abstain from deciding the case, as the case presents unsettled issues of state law that may moot the need for federal constitutional analysis. Third, it requests the court to compel Synagro under Federal Rule of Civil Procedure 12(e) to provide a more definite statement.

We will not abstain from the case. Rush Township's motion to dismiss will be granted in part and denied in part; we will dismiss all counts of the complaint except Counts IV, VII, and IX. Rush Township's motion for more definite statement will be denied.

### DISCUSSION:

#### I. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) admits the well-pleaded allegations of the complaint but denies their legal sufficiency. *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In reviewing a motion to dismiss under 12(b)(6), the court must accept as true all factual allegations of the complaint and draw all reasonable inferences in the light most favorable to the plaintiff. *Board of Trustees of Bricklayers and Allied Craftsmen Local 6 of New Jersey v. Wettlin Assoc., Inc.,* 237 F.3d 270, 272 (3d Cir. 2001) (citation omitted). But "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *General*

*Motors Corp. v. New A.C. Chevrolet,* 263 F.3d 296, 333 (3d Cir.2001) (citation and internal quotation marks omitted).

"A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *Ramadan v. Chase Manhattan Corp.,* 229 F.3d 194, 195–96 (3d Cir.2000) (citing *Alexander v. Whitman,* 114 F.3d 1392, 1398 (3d Cir. 1997)). "The issue [under Rule 12(b)(6)] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir.2000) (citations and internal quotation marks omitted).

Synagro challenges the validity of a municipal ordinance. Virtually each of Synagro's allegations—i.e. preemption, equal protection, substantive due process, etc.—involve almost exclusively questions of law and present little or no need for factfinding. Synagro asserts that regardless of the merit of its legal arguments, its claims should be sustained at this stage as long as they properly allege the legal theory that forms the basis for the claims. For example, it argues that its federal preemption claim should be sustained because it alleges that the Ordinance is preempted. This contention suggests that Synagro misapprehends the nature of a motion to dismiss.

"Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "This procedure, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding." *Id.* at 326–27, 109 S.Ct. 1827. "[I]f, as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* at 327, 109 S.Ct. 1827 (citations and internal quotation marks omitted). Keeping this in mind, we will dismiss any of Synagro's claims that lack merit, but we will sustain the ones that may succeed.

We must stress that the instant motion was filed by Rush Township and seeks only dismissal of the complaint. While Synagro has filed a motion for summary judgment and has requested us to rule immediately on that motion, we believe that the most logical course of action is to rule first on Rush Township's 12(b)(6) motion. Thus, we do not have before us at this time a request to enter judgment in favor of Synagro. Accordingly, even though we have the ultimate responsibility to decide the issues before us, the only two possible results with respect to each claim are either a dismissal of the claim or a sustaining of the claim. In the event that we sustain any of Synagro's claims, we express no opinion at to whether Synagro will ultimately succeed. Other courts in similar situations have proceeded similarly. *See, e.g., Qwest Communications Corp. v. The City of Berkeley,* 146 F.Supp.2d 1081, 1090 (N.D.Ca.2001) (sustaining but not adjudicating a claim for federal preemption).

## II. SYNAGRO'S COMPLAINT

Synagro provides professional management of treated municipal sewage sludge for municipal treatment plants throughout the United States. Included in Synagro's services is the application of sewage sludge for the reclamation of sites formerly used for surface mining. Synagro refers to the municipal sewage sludge as "biosolids"; we will use the terms interchangeably.

An entity that wishes to apply biosolids to land sites must obtain the consent of the landowner and register the site with the

Pennsylvania Department of Environmental Protection (DEP). Synagro has 5 sites in Rush Township that are permitted for mine reclamation with biosolids. Synagro received from the DEP all of the necessary permits and approvals required for it to apply biosolids to the sites. At the time Synagro filed its complaint, certain sites had yet to be reclaimed.

After Synagro began biosolids application in one of its land sites, Rush Township enacted the Land Application of Sewage Sludge Ordinance. The Ordinance's stated purpose is "[t]o protect the health, safety and general welfare of all township citizens and other persons by seeking to prevent exposure to any toxic or other harmful material contained in sewage sludge...." (Ordinance, Attached to Complaint, Rec. Doc. No. 1, at § 1.1(A).) The Ordinance applies to "all current existing permits issued or authorized by PA DEP for the land application of sewage sludge in Rush Township." (*Id.* at § 10.)

The Ordinance claims to be consistent with federal and state regulation of sewage sludge, but it sets forth additional preliminary procedural requirements of any entity that wishes to apply sewage sludge in Rush Township. Before sewage sludge may be applied in Rush Township, two documents must be obtained. First, the wastewater treatment facility that generates the sewage sludge must obtain a "Site Registration," which is a document that confirms that the proposed site meets all federal, state, and local regulations pertaining to the application of sewage sludge. Second, the entity applying the sewage sludge must obtain a "Land Application Registration," which is an authorization by Rush Township to apply sewage sludge on agricultural lands within the township.

The Ordinance mandates a considerable number of procedural requirements for obtaining a Site Registration and a Land Application Registration. An applicant must submit all DEP application material to Rush Township for review and consideration. In addition, the applicant must subject the featured land to many tests, including soil analysis and groundwater analysis. After completing the tests, the applicant must provide Rush Township with reports based on these tests. The applicant also must submit documents such as a map of the surface waters on the proposed site and a memorialization of a county-approved plan to manage surface water and control erosion on the site.

In addition to prescribing requirements for obtaining Site Registration and a Land Application Registration, the Ordinance regulates the transportation of sewage sludge. For example, the Ordinance requires that sewage sludge may be transported within Rush Township only from the hours of 6:00 AM to dusk, Monday through Friday.

The provisions of the ordinance are enforced by the Rush Township Board of Supervisors. An amendment to the ordinance, enacted on November 4, 1999, requires a tipping fee of $40.00 per ton of sewage sludge applied upon any land in Rush Township.

Synagro claims that the requirements imposed by the Ordinance have, among other things, forced it to find land sites in other Townships; it alleges in excess of $2,560,000 in damages.

## III. ANALYSIS

Before addressing the substance of the issues, we must decide whether to abstain from adjudicating the case. The Supreme Court has recognized several types of abstention. Rush Township requests that the court abstain under the doctrines of *Burford* abstention, *see Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Pullman* abstention, *see Railroad Comm'n of Tex. v. Pullman Co.,* 312

**834**

U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), or both.

■ *Burford* abstention is clearly inappropriate; it applies only when there exists a "state order[ ] against an individual party that a federal-court plaintiff seeks to enjoin." *Keeley v. Loomis Fargo & Co.,* 183 F.3d 257, 273 n. 13 (3d Cir.1999). Where the law at issue is a general legislative act and not "a specific administrative order aimed at one party," *id.*, *Burford* abstention is inapplicable.

■ Thus, we are left with *Pullman* abstention. A federal court may abstain under *Pullman* when faced with a federal constitutional issue that may be mooted by a state-court determination of state law. Rush Township argues that because this case presents issues of state law of which a certain resolution by a state court may moot certain avenues of federal constitutional analysis, we should abstain from deciding the case.

■ *Pullman* abstention applies " 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law.' " *Planned Parenthood of Central New Jersey v. Farmer,* 220 F.3d 127, 149 (3d Cir. 2000) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). "[A]bstention under *Pullman* is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." *Id.* (citing *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)) (internal quotation marks omitted). Where appropriate, federal courts invoke *Pullman* abstention to avoid needless friction with state policies. *See Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman,* 99 F.3d 101, 106 (3d Cir.1996) (citations omitted).

■ Before a federal court may abstain under *Pullman,* three "exceptional" circumstances must be present. "First, there must be 'uncertain issues of state law underlying the federal constitutional claims.' " *Farmer,* 220 F.3d at 149 (quoting *Whitman,* 99 F.3d at 106). "Second, the state law issues must be amenable to a state court interpretation which could 'obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim.' " *Id.* at 149–150 (quoting *Whitman,* 99 F.3d at 106). "Third, it must be that 'an erroneous construction of state law by the federal court would disrupt important state policies.' " *Id.* at 150 (quoting *Whitman,* 99 F.3d at 106).

■ Even if all three circumstances exist, the federal court retains the discretion whether or not to abstain. The court must determine "whether abstention is appropriate by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Id.* (citing *Artway v. Attorney General of New Jersey,* 81 F.3d 1235, 1270 (3d Cir.1996)).

Rush Township points out that the instant case contains many state-law issues, such as preemption of the Ordinance by state statutes, analysis under the Pennsylvania Constitution, and a question of whether Rush Township had the state-given authority to enact the Ordinance. It contends if a state court decides any of these issues in Synagro's favor, then the Ordinance would be invalid and this court would not be required to analyze it under the federal constitution. It argues that, accordingly, we should abstain pending a state-court determination of the state-law issues.

■ While Rush Township is correct that a state-court adjudication of certain issues may moot the federal constitutional issues, it has not persuaded us that we should abstain. We note at the outset that "the party arguing in favor of abstention bears a heavy burden of persuasion. . . ." *Capital Bonding Corp. v. New Jersey Supreme Court*, 127 F.Supp.2d 582, 591 (D.N.J.2001) (citing *Chiropractic America v. Lavecchia*, 180 F.3d 99, 103 (3d Cir. 1999)). Further, we emphasize that we have diversity jurisdiction, and "*Pullman* abstention is 'virtually prohibited in diversity cases where the only difficulty is the unsettled posture of state law.'" *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 819 (3d Cir.1994) (quoting *Urbano v. Board of Managers of N.J. State Prison*, 415 F.2d 247, 253 (3d Cir.1969)).

Rush Township fails to meet its burden of persuasion. After vigorously arguing that the Ordinance is not preempted by any state law and is valid under the Pennsylvania Constitution, Rush Township cursorily contends that because a state court might rule in Synagro's favor on one or more issues of state law, this court should abstain and turn the matter over to a state court. This conclusory argument is insufficient to persuade a federal court to abstain. Because Rush Township has failed to articulate any unsettled areas of state law (other than in the most general terms), we do not have the authority to abstain. As the Third Circuit has put it, "[if] no unsettled question of state law has been identified, abstention under the *Pullman* doctrine is not appropriate." *Schall v. Joyce*, 885 F.2d 101, 113 (3d Cir.1989) (citations omitted). Even assuming that Synagro's nonspecific assertions could pass for sufficient identifications of unsettled state law, we reject the abstention request because Rush Township fails to argue that an erroneous construction of state law by this court would disrupt important state policies. Without any semblance of an argument on this point, Rush Township cannot meet its burden, and we lack the authority to abstain. Our inability to abstain is magnified by the fact that this is a diversity case.

Even if we do have the authority to abstain from deciding the case, we will exercise our discretion and choose not to abstain. This case has been pending since September of 2000, and refraining from deciding the case may be unduly harmful to Synagro, which alleges that the Ordinance is making it prohibitively expensive to apply sewage sludge to mining sites. Any delay due to abstention potentially could be extremely harmful to Synagro.

Thus, we will analyze each claim before us.

### Count I: Preemption by the Surface Mining Control and Reclamation Act

Synagro's position is that the Ordinance is preempted by the federal Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201–1328.

■ Federal law may preempt state law in one of three ways: (1) express preemption, which arises when there is an explicit federal statutory command that state law be displaced; (2) field preemption, which results when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it; and (3) conflict preemption, which arises when a state law makes it impossible to comply with both state and federal law or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *The St. Thomas–St. John Hotel & Tourism Assoc., Inc. v. Government of the U.S. Virgin Islands*, 218 F.3d 232, 238 (3d Cir. 2000). "By referring to these three cate-

gories, we should not be taken to mean that they are rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. General Electric Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

In 1977, Congress enacted SMCRA. One of SMCRA's stated purposes is "to establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). Among other things, the statute seeks to "assure that adequate procedures are undertaken to reclaim surface areas as contemporaneously as possible with the surface coal mining operations." 30 U.S.C. § 1202(e).

SMCRA established the Office of Surface Mining Reclamation and Enforcement (OSM) as a subdivision of the Department of the Interior. 30 U.S.C. § 1211(a). The Secretary of the Interior executes programs for controlling surface coal mining. 30 U.S.C. § 1211(c).

SMCRA's regulatory and enforcement provisions are set forth in Subchapter V of the statute. 30 U.S.C. §§ 1251–1279. Any person or company seeking to engage in surface coal mining operations must first secure a permit. 30 U.S.C. § 1256. The permit must require the surface coal mining operation to satisfy certain environmental protection performance standards. 30 U.S.C. §§ 1265–66. Permit holders who violate any permit condition or who violate any other provision of Sub-

chapter V may be assessed with civil penalties. 30 U.S.C. § 1268(a).

In addition to setting forth the provisions for federal enforcement of SMCRA, the statute provides that states may "assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on nonfederal lands within the state. 30 U.S.C. § 1253(a). The Supreme Court has characterized this feature of SMCRA as "a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Virginia Surface Mining and Reclamation Assoc., Inc.*, 452 U.S. 264, 289, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). To achieve this regulatory authority, a state must submit to the Secretary a proposed program "which demonstrates that such State has the capability of carrying out the provisions of [SMCRA] and meeting its purposes . . . ." *Id.* The proposed state program must contain state laws that provide for the regulation of surface coal mining and reclamation operations in accordance with the requirements of SMCRA. 30 U.S.C. § 1253(a)(1). The state scheme must also feature "rules and regulations consistent with regulations issued by the Secretary pursuant to [SMCRA]." 30 U.S.C. § 1253(a)(7).

Any changes contemplated by the state to its federally-approved program must be submitted for approval to the OSM Director. 30 C.F.R. § 732.17(g). The OSM Director must review the proposed changes with reference to the criteria set forth in 30 C.F.R. § 732.15 for the approval or disapproval of the original state program. *See* 30 C.F.R. § 732.17(h)(10).

On July 31, 1982, the Secretary approved the Pennsylvania regulatory program for surface coal mining and recla-

mation operations. The Pennsylvania program is presented in the Pennsylvania Surface Mining Conservation and Reclamation Act ("PaSMCRA"), 52 P.S. §§ 1396.1–1396.31, and its accompanying regulations, 25 Pa.Code §§ 86.1–86.242. PaSMCRA is enforced by the Pennsylvania Department of Environmental Resources (the Department). 52 P.S. § 1396.4(c). Pennsylvania's plan is similar to SMCRA in that it imposes strict permit requirements for surface mining activities. 52 P.S. § 1396.4(a). It also requires that a plan for reclamation of lands disturbed by mining be approved by the Department. *See* 52 P.S. 1396.4(2).

Synagro's first argument is that because SMCRA did not provide for any local ordinances regulating surface mining, it expressly preempts Rush Township's Ordinance, which was enacted by Rush Township and not the state of Pennsylvania. In the sections dealing with state programs, SMCRA speaks in terms of the state having exclusive regulatory jurisdiction. The Secretary approves a state plan that contains state laws, and only that plan is valid. Synagro points out that SMCRA does not explicitly allow for local ordinances in addition to the state plan, and it notes that even if the federal statute did allow for this possibility, the Secretary was required to approve the Ordinance, which regulates sewage sludge disposal, a surface mining activity.

We agree that SMCRA does not comment on the role of local government in legislating surface mining activities, and we realize that the Secretary did not approve the Ordinance. We cannot agree, however, that the Ordinance is preempted by SMCRA.

The Supreme Court analyzed a similar preemption question in *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). The issue in *Mortier* was whether the Federal Insecticide, Fungicide, and Rodenticide Act (FIRFA), 7 U.S.C. § 136 et seq., preempted municipal regulation of pesticide use. Section 136v(a) of FIRFA states that "[a] State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." *Id.* Respondent Mortier argued that because § 136v(a) gave regulatory authority only to states and not to municipalities, the municipalities were not at all permitted to regulate pesticide use. The Court found that the statute's language was "wholly inadequate to convey an express preemptive intent on its own ... [and that] mere silence, in this context, cannot suffice to establish a clear and manifest purpose to pre-empt local authority." *Mortier*, 501 U.S. at 607, 111 S.Ct. 2476 (citations and internal quotation marks omitted). The Court found that the federal statute did not exclude the possibility of allowing local regulation and that the question of whether to allow local regulation must be answered by the states themselves:

> Properly read, the statutory language tilts in favor of local regulation. The principle is well settled that local governmental units area created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them ... in [its] absolute discretion. The exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s] because political subdivisions are components of the very entity the statute empowers." Indeed, the more plausible reading of FIRFA's authorization to the States leaves the allocation of regulatory authority to the "absolute discretion" of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities.

*Id.* at 607–608, 111 S.Ct. 2476. Courts that have departed from *Mortier* generally were analyzing similar grants of regulatory authority to states, but these courts recognized that the federal statutes that they were analyzing contained independent references to rulemaking by a state's political subdivisions, while FIRFA did not. Thus, the courts held, because Congress referred to political subdivisions in other instances throughout the statute, it intentionally omitted any reference to municipalities when it gave states regulatory authority. *See, e.g., R. Mayer of Atlanta v. City of Atlanta,* 158 F.3d 538, 545–546 (11th Cir.1998)..

Consistent with *Mortier,* we find that SMCRA does not preempt local regulation in the area of surface mining. SMCRA gives states with federally approved programs exclusive regulatory jurisdiction over surface mining. A municipality is a political subdivision of a state; we see no reason why a state plan may not delegate authority to a municipality or allow consistent municipal regulations. To be sure, SMCRA does not expressly confer any regulatory authority on municipalities. But it does not undermine its own silence by independently referring to municipalities at any other point in the statute.

Next, Synagro argues that by enacting SMCRA and its expansive regulations, Congress preempted the field of surface mining such that the Rush ordinance has no force. We disagree. Field preemption is a doctrine whereby Congress regulates an area so fully that any state or local law should be given no force. That is not the case here. While Congress passed SMCRA to legislate the area of surface mining, it had a stated goal of allowing the states to have exclusive jurisdiction over their own lands. "We have encountered nothing in [SMCRA] or [its] legislative history which leads us to believe that anything other than the ordinary meaning of the word 'exclusive' was intended by the enactors of the SMCRA." *See Haydo v. Amerikohl Mining, Inc.,* 830 F.2d 494, 497 (3d Cir.1987). Congress approved Pennsylvania's state program and must approve any amendments to the program, but it is Pennsylvania that now has regulatory jurisdiction over surface mining within the state's borders. Congress has very little to do with Pennsylvania's surface mining laws now that the PaSMCRA has been approved. After a state plan is approved, the relevant law becomes the approved state plan rather than SMCRA. When the Secretary approved Pennsylvania's plan as set forth in PaSMCRA, the issue of the preemption of local law ceased to be within the province of the federal Supremacy Clause and became a concern of Pennsylvania state law. It is conceivable that the federal government may approve a state regulatory plan allowing for local ordinances consistent with the state plan. In fact, § 17.1 of PaSMCRA, while preempting local legislation of surface mining, allows for certain local ordinances that were already in existence when PaSMCRA was approved:

> **Except with respect to ordinances adopted pursuant to the act of July 31, 1968 (P.L. 805, No. 247), known as the "Pennsylvania Municipalities Planning Code,"** all local ordinances and enactments purporting to regulate surface mining are hereby superseded. The Commonwealth by this enactment hereby preempts the regulation of surface mining as herein defined.

52 P.S. 1396.17a (emphasis added). *See Miller & Son Paving, Inc. v. Wrightstown Township,* 499 Pa. 80, 451 A.2d 1002, 1005 (1982) (interpreting PaSMCRA to preserve local zoning ordinances in existence on the effective date of PaSMCRA). The Secretary adopted PaSMCRA with this explicit reference to local ordinances. SMCRA, then, does not preempt the field of surface mining.

Synagro also claims that SMCRA preempts the Rush ordinance because the ordinance conflicts with the federal statute. Synagro's argument is that the ordinance imposes on entities involved with sewage sludge certain requirements beyond those approved by the Secretary when PASMCRA was enacted. As with Synagro's claim of field preemption, the correct starting point is PaSMCRA, because after Pennsylvania's state program has been federally approved, the federal statute ceased to have a direct effect on Pennsylvania surface mining. *See Haydo*, 830 F.2d at 497 ("Congress recognized that 'because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the states.' ") (quoting 30 U.S.C. § 1201(f)). Thus, no conflict exists.

### Count II: Preemption by PaSMCRA

 Synagro argues that the Ordinance, a local law, is preempted by PaSMCRA, a state statute. In *Mars Emergency Medical Services, Inc. v. Township of Adams*, 559 Pa. 309, 740 A.2d 193 (1999), the Pennsylvania Supreme Court, quoting its own opinion in an earlier case, set forth the "well-established" law of state preemption of local legislation. We will quote that passage in its entirety:

There are statutes which expressly provide that nothing contained therein should be construed as prohibiting municipalities from adopting appropriate ordinances, not inconsistent with the provisions of the act or the rules and regulations adopted thereunder, as might be deemed necessary to promote the purpose of the legislation. On the other hand, there are statutes which expressly provide that municipal legislation in regard to the subject covered by the State act is forbidden. Then there is a third class of statutes which, regulating some industry or occupation, are silent as to whether municipalities are or are not permitted to enact supplementary legislation or to impinge in any manner upon the field entered upon by the State; in such cases the question whether municipal action is permissible must be determined by an analysis of the provisions of the act itself in order to ascertain the probable intention of the legislature in that regard. It is of course self-evident that a municipal ordinance cannot be sustained to the extent that it is contradictory to, or inconsistent with, a state statute. But, generally speaking it has long been the established general rule, in determining whether a conflict exists between a general and local law, that where the legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable.

*Id.* at 195 (quoting *Western Pennsylvania Restaurant Ass'n v. Pittsburgh*, 366 Pa. 374, 77 A.2d 616, 619–20 (1951)) (internal quotation marks and internal citations omitted).

Other Pennsylvania courts have listed pertinent questions to consider when determining whether local legislation is preempted. The questions are:

(1) Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is, does the ordinance forbid what the legislature has permitted? (2) Was the state

law intended expressly or impliedly to be exclusive in the field? (3) Does the subject matter reflect a need for uniformity? (4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? (5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature?

705 A.2d 947, 949–50 (Pa.Cmwlth.1998) (citing *Duff v. Township of Northampton,* 110 Pa.Cmwlth. 277, 532 A.2d 500, 505 (1987)). The Pennsylvania Supreme Court in *Mars* noted that as of October 28, 1999, it had found that Pennsylvania preempted the field in only three areas: alcoholic beverages, anthracite strip mining, and banking. *Mars,* 740 A.2d at 195 (citing *Council of Middletown Township v. Benham,* 514 Pa. 176, 523 A.2d 311, 313–14 (1987)).

Synagro argues that § 17a of PaSMC-RA, which states that all local ordinances purporting to regulate surface mining are superseded, leads to the conclusion that the Ordinance is preempted. For Synagro's argument to succeed, the application of sewage sludge to mine sites must fall under PaSMCRA's definition of "surface mining." PaSMCRA, as encoded in 52 P.S. § 1396.3, sets forth what does and what does not constitute "surface coal mining activities" and "surface mining activities" under PaSMCRA:

> "Surface coal mining activities" shall mean, for the purposes of section 4.6, activities whereby coal is extracted from the earth, from waste or stockpiles or from pits or banks by removing the strata or material which overlies or is above or between the coal or by otherwise exposing and retrieving the coal from the surface. The term shall include, but not be limited to, strip and auger mining and all surface activity connected with surface mining including exploration, site preparation, construction and activities related thereto. The term shall also include all activities in which the land surface has been disturbed as a result of, or incidental to, surface mining operations of the operator, including those related to private ways and roads appurtenant to the area, land excavations, workings, refuse banks, spoil banks, culm banks, tailings, repair areas, storage areas, processing areas, shipping areas, and areas where facilities, equipment, machines, tools or other materials or property which result from or are used in surface mining activities are situated.

> "Surface mining activities" shall mean the extraction of coal from the earth or from waste or stock piles or from pits or banks by removing the strata or material which overlies or is above or between them or otherwise exposing and retrieving them from the surface, including, but not limited to, strip, auger mining, dredging, quarrying and leaching, and all surface activity connected with surface or underground mining, including, but not limited to, exploration, site preparation, entry, tunnel, drift, slope, shaft and borehole drilling and construction and activities related thereto, but not including those portions of mining operations carried out beneath the surface by means of shafts, tunnels or other underground mine openings.

**"Surface mining activities" shall not include any of the following:**

(1) Extraction of coal or coal refuse removal pursuant to a government-financed reclamation contract for the purposes of section 4.8.

(2) Extraction of coal as an incidental part of Federal, State or local government-financed highway construction pursuant to regulations promulgated by the Environmental Quality Board.

*(3) The reclamation of abandoned mine lands not involving extraction of coal or excess spoil disposal under a written agreement with the property owner and approved by the department.*

(4) Activities not considered to be surface mining as determined by the United States Office of Surface Mining, Reclamation and Enforcement and set forth in department regulations.

*Id.* (emphasis added). The definition of "surface coal mining activities" or "surface mining activities" indicates that the dumping of sewage sludge for reclamation purposes is not a surface mining activity and thus does not fall within PaSMCRA's preemption clause. Synagro offers a conclusory argument that because PaSMCRA preempts ordinances that regulate mining activity, the Ordinance is preempted, as regulates mining activities. Synagro does not, however, state how the Ordinance regulates mining activities. The only conclusion we can draw is that Synagro asserts that applying sewage sludge is equivalent to a mining activity. This is not the case. Because the Ordinance does not regulate surface mining, it is unaffected by PaSMCRA's preemption clause.

Synagro's only other argument in support of preemption is that because the Ordinance introduces a level of regulation of mining permits above and beyond that required by the DEP, it is preempted. It cites the case of *Pennsylvania Coal Co. v. Township of Conemaugh,* 149 Pa.Cmwlth. 22, 612 A.2d 1090 (1992). In *Conemaugh,* the owners and lessees of land on which surface mining operations were conducted sought a declaratory judgment on the validity of a zoning ordinance that regulated surface mining operations. The Court of Common Pleas dismissed the plaintiffs' complaint. The Commonwealth Court reversed the decision, finding that because the ordinance regulated the operation of surface coal mining in the township, it was preempted by PaSMCRA. *Id.* at 1093–94. Synagro's argument, that the Ordinance is invalid because it adds regulation not required by the DEP, is unclear, and we fail to see how it relates to the *Conemaugh* case. *Conemaugh* found simply that because the local ordinance regulated surface mining, it was preempted. Any application of *Conemaugh* to the instant case would occur only if the Rush Township Ordinance regulated surface mining. We found that it does not. Thus, *Conemaugh* is inapplicable, and Synagro's argument is without merit.

Because the Ordinance does not regulate surface mining, it is not preempted by PaSMCRA.

### Count III: Substantive Due Process

Synagro alleges that the Ordinance violates the Due Process Clause of the Fourteenth Amendment in that it is "manifestly arbitrary, capricious and irrational, and was not enacted for the purpose of promoting health, safety, morals or the general welfare of the community." (Complaint at 89.)

Synagro does not dispute that because the Ordinance neither creates a suspect classification nor a infringes on a fundamental right, it is subject to review under the "rational basis" standard. Under this standard of review, we "inquire only to see if [the Ordinance] is a rational means of achieving a legitimate [government] interest." *Alexander v. Whitman,* 114 F.3d 1392, 1406 (3d Cir.1997).

When subjecting a state or local law to rational basis review, "'a court … is not entitled to second guess the legislature on the factual assumptions or policy considerations underlying the statute.'" *Id.* (quoting *Sammon v. New Jersey Bd. of Med. Examiners,* 66 F.3d 639, 645 (3d Cir.1995)). "The only inquiry permitted 'is whether the legislature rationally might

have believed that the predicted reaction would occur or that the desired end would be served.'" *Id.* (quoting *Sammon*, 66 F.3d at 645). "It is up to the person challenging the statute to 'convince the court that the legislative facts on which the classification [of the statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker.'" *Id.* (quoting *Sammon*, 66 F.3d at 646). "A statute 'withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute.'" *Id.* (quoting *Sammon*, 66 F.3d at 645).

■ Rush Township defends the Ordinance on the grounds that it was enacted in order "to protect the health, safety and general welfare of all township citizens and other persons by seeking to prevent exposure to any toxic or other harmful material contained in sewage sludge ..." (Defendant's Brief, Rec.Doc. No. 10, at 12.) Synagro argues that because it pleaded that the Ordinance is not rationally related to any legitimate government interest, the federal notice pleading requirements are satisfied and the claim should be sustained.

Synagro's "pleadings" are merely unsupported legal conclusions that we are not bound to accept. In any event, the Ordinance must survive rational basis review because Rush rationally might have believed that the Ordinance would serve to protect its citizens from the dangers of sewage sludge. Certainly, Rush Township rationally could conclude that an Ordinance monitoring the safety of sewage sludge would serve the interest of protecting its citizens from the harmful effects of sewage sludge. Notwithstanding Synagro's argument that the claim should survive because it contains the requisite elements of a substantive due process challenge, we are entitled at the 12(b)(6) stage to dismiss a substantive due process

claim when the legislative body offers a rational basis for its action. *Alexander*, 114 F.3d at 1406 (dismissing at the 12(b)(6) stage a substantive due process claim when the State offered a rational basis for a wrongful death statute). Because Rush Township provides a rational basis for its actions, the Ordinance withstands substantive-due-process review.

### Count IV: Commerce Clause

Synagro alleges that the Ordinance in two ways violates the Commerce Clause of the United States Constitution. First, Synagro argues that the monitoring of the times when biosolids may be transported extends to biosolids carriers that are just passing through the state, thus affecting interstate commerce. Second, Synagro contends that the $40–per–ton fee places an undue burden on interstate commerce.

The Commerce Clause of the United States Constitution provides that "Congress shall have Power ... to regulate Commerce ... among the several States." U.S. Const. art. I, § 8. "While the Commerce Clause explicitly confers power to Congress, it has been interpreted to contain an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Oxford Assoc. v. Waste System Auth. of Eastern Montgomery County*, 271 F.3d 140, 146 (3d Cir.2001) (quoting *Tolchin v. Supreme Court of the State of New Jersey*, 111 F.3d 1099, 1106 (3d Cir.1997); *Western & Southern Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 652, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981)). "This implied limitation is often referred to as the 'dormant Commerce Clause.'" *Id.*

■ The dormant Commerce Clause "'prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Tolchin*, 111 F.3d at 1106 (quoting (*New Energy Co. of*

*Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988))).

"The courts have developed a two-tier[ed] analysis to determine if an action violates the dormant Commerce Clause." *Cloverland–Green Spring Dairies v. Pennsylvania Milk Marketing Board,* 138 F.Supp.2d 593, 604 (M.D.Pa.2001). First, a court must determine whether the ordinance discriminates against interstate commerce. Second, the court must determine whether the ordinance imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits. *Id.* (citing *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)).

In determining whether the ordinance discriminates against interstate commerce, discrimination is defined as the " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Id.* (quoting *Harvey & Harvey, Inc. v. County of Mercer Pennsylvania,* 68 F.3d 788, 797 (3d Cir.1995)).

If a state law discriminates against interstate commerce " 'either on its face or in practical effect,' " *id.* (quoting *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)), then the law " 'is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.' " *Id.* (quoting *C & A Carbone, Inc.,* 511 U.S. at 392, 114 S.Ct. 1677).

"If a statute only indirectly affects interstate commerce and regulates evenhandedly," *Tolchin,* 111 F.3d at 1106–1107, the second step of the commerce clause analysis requires application of a "balancing test whereby the statute will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Harvey & Harvey,* 68 F.3d at 797 (citing *Pike v. Bruce Church Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

The parties seem to agree that the correct standard to apply is that the Ordinance will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the local benefits. Rush Township argues that even though the Ordinance "has an incidental effect on interstate commerce" (Defendant's Brief, Rec.Doc. No. 10, at 15), it should be upheld because the burden on interstate commerce is slight compared to the local benefits, which include protecting the safety of Rush Township citizens by testing sewage sludge for land application. Synagro argues that its claim should be sustained because it has properly pleaded the elements of a dormant Commerce Clause violation, i.e., that the Ordinance unfairly discriminates against interstate commerce. Because at this stage of the proceedings we are not in the position to judge either the Ordinance's effect on interstate commerce or the extent of the local benefits of the Ordinance, we will sustain the claim in order to have the aid later on of a more fully developed record. *See Camden County Board of Chosen Freeholders v. Beretta U.S.A. Corp.,* 123 F.Supp.2d 245, 255 (D.N.J.2000) (denying a motion to dismiss a dormant Commerce Clause claim where the effects on commerce and the local benefits of the law were yet unclear).

**Count V: Equal Protection**

Synagro asserts a claim under the Equal Protection Clause of the Fourteenth Amendment. Its allegations are as follows: (1) the Ordinance's $40–per–ton fee treats appliers of biosolids differently than it treats similarly situated entities that apply organic materials other than biosolids; (2) the Ordinance's partial ban on the

transportation of biosolids treats transporters of biosolids differently than it treats similarly situated entities that transport other materials. Synagro contends that the Ordinance is not rationally related to a legitimate government purpose.

The Equal Protection Clause of the Fourteenth Amendment "announces a fundamental principle: the State must govern impartially, and directs that all persons similarly circumstanced shall be treated alike." *Alexander*, 114 F.3d at 1406–1407 (citations and internal quotation marks omitted).

■ "However, The clause does not require that things which are different in fact be treated in law as though they are the same." *Id.* at 1407 (citation omitted). "Accordingly, 'the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others.'" *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

Because the Ordinance "neither proceeds along suspect lines nor infringes fundamental constitutional rights," *id.* (citation and internal quotation marks omitted), it "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citation and internal quotation marks omitted).

Rush Township asserts that the reason for the classification based on appliers and transporters of sewage sludge is that sewage sludge, as distinguished from other organic materials and fertilizers, contains heavy metals, industrial residues, and potentially dangerous organic chemicals. Synagro contends that because it properly alleged that the Ordinance treats sewage sludge entities differently than it treats other entities, its claim must be sustained. Similarly, Synagro argues that Rush Township's proffered justification is an insufficient basis at the 12(b)(6) stage for the court to uphold the Ordinance.

■ Synagro's arguments are misplaced, and Rush Township provides us with a reason to uphold the Ordinance. Synagro's allegations are simply legal conclusions without any factual support. In any event, the rational-basis standard commands that the Ordinance must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. "'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.'" *Id.* at 1408 (quoting *Heller v. Doe*, 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). A court may, on a 12(b)(6) motion, reject an equal protection claim if the court finds the legislative body's purported reason for the classification to be valid and the plaintiff fails to undermine the basis for the classification. *See id.* The difference in safety between sewage sludge and other types of waste is a sound, rational basis for creating the classification, and Synagro makes no attempt to discredit it. Accordingly, the Ordinance survives Synagro's equal protection challenge.

## Count VI: Uniformity Clause

Synagro argues that the Ordinance violates the Uniformity Clause of the Pennsylvania Constitution in that (1) the $40–per–ton fee is an arbitrary and unreasonable distinction between transporters of biosolids and other transporters of organic materials; (2) the $40–per–ton fee is not rationally related to any legitimate government interest; and (3) the $40–per–ton fee is not applied uniformly upon similar kinds of businesses and property.

The Uniformity Clause of the Pennsylvania Constitution provides that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under the general laws." Pa. Const. art. VIII, § 1. "To be uniform, a tax must 'operate alike on the classes of things or property subject to it.'" *Parsowith v. Commonwealth Dep't. Revenue*, 555 Pa. 200, 723 A.2d 659, 663 (1999) (quoting *Dept. of Justice, Commonwealth v. Overholt & Co.*, 331 Pa. 182, 200 A. 849, 853 (1938)). We note that for the purposes of analysis under the Uniformity Clause, Rush Township does not dispute that the $40–per–ton "fee" may be classified as a "tax" that is subject to Uniformity Clause scrutiny.

■ "When challenging a taxing statute, it is the taxpayer's burden to demonstrate that a classification is unreasonable, in that it is not rationally related to any legitimate state purpose." *Id.* (citing *Leonard v. Thornburgh*, 507 Pa. 317, 489 A.2d 1349, 1352 (1985)).

■ "[A] tax enactment will not be invalidated unless it clearly, palpably, and plainly violates the Constitution." *Wilson Partners, L.P. v. Commonwealth Bd. of Finance and Revenue*, 558 Pa. 462, 737 A.2d 1215, 1220 (1999) (citations and internal quotation marks omitted). The Uniformity Clause does not require absolute equality and perfect uniformity in taxation, and any doubts as to the constitutionality of the statute are to be resolved in favor of upholding the statute. *Parsowith*, 723 A.2d at 663–64 (citing *Leonard*, 489 A.2d at 1352).

■ "The analysis under the uniformity clause of the Pennsylvania Constitution is generally the same as that under the equal protection clause of the United States Constitution." *Wilson Partners*, 737 A.2d at 1220 n. 11 (citing *Leonard*, 489 A.2d at 1349).

■ In seeking dismissal of Synagro's claim under the Uniformity Clause, Rush Township asserts that (1) the purpose of the $40–per–ton fee is to protect the health, safety, and welfare of Rush Township's citizens by financing the testing of sewage sludge for safety; and (2) the $40–per–ton fee is imposed uniformly on all companies that dispose of sewage sludge in Rush Township.

In response, Synagro argues that because it has adequately pleaded the elements of a claim under the Uniformity Clause, its claim should be sustained. Synagro points out that it asserts that (1) the tax makes an arbitrary and unreasonable distinction between different transporters of organic material; that (2) the tax is not rationally related to any legitimate government interest; and that (3) the tax is not uniformly applied. According to Synagro, these "facts," which may be proven true during discovery, are sufficient in the face of a 12(b)(6) challenge. Further, Synagro argues that the tax is levied only on companies that apply biosolids in order to condition the soil or fertilize the crops, and not on all companies that dispose of sewage sludge.

Synagro has not met its burden to demonstrate that any alleged classification is unreasonable and not rationally related to any legitimate state purpose. Its unsupported legal conclusions relating to the lack of uniformity of the Ordinance are insufficient to survive a 12(b)(6) motion, and a court may not in these circumstances second-guess Rush Township's purported reasons for enacting the law. When analyzing laws under the rational basis standard of the federal Equal Protection Clause—an analysis that is equivalent to the instant analysis under Pennsylvania Uniformity Clause—the Supreme Court has stated that "[a] statutory discrimination will not be set aside if any state of

facts reasonably may be conceived to justify it.'" *Jimenez v. Weinberger,* 417 U.S. 628, 633, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (quoting *McGowan,* 366 U.S. at 426, 81 S.Ct. 1101). Rush Township's reason for charging a fee to only the sewage sludge companies as opposed to all companies dealing with organic material, i.e., to finance testing to protect its citizens from the danger of sewage sludge, is a reasonably conceived and acceptable justification for the classification. Even assuming that it is a "tax," the fee is rationally related to the legitimate township interest of protecting its citizens from the harmful effects of sewage sludge. Further, as Rush Township asserts, the Ordinance indicates that the fee is applied uniformly, as the amendment to the Ordinance states that "there is hereby imposed a FORTY AND NO/100 ($40.00) DOLLARS per ton tipping fee for each ton of biosolids applied on any land within Rush Township pursuant to this ordinance." (Amendment to Ordinance at § 8.1.) The fee is uniform, as it is levied on every company that applies sewage sludge on Rush Township. In short, there is no violation of the Uniformity Clause.

### Count VII: Preemption by other state statutes

Synagro alleges that the Ordinance is preempted by at least one of the following three Pennsylvania statutes: The Nutrient Management Act, 3 P.S. § 1701 et seq., The Sewage Facilities Act, 35 P.S. § 750.1 et seq., and the Solid Waste Management Act, 35 P.S. § 6018.101 et seq.

1. Nutrient Management Act (NMA)

The NMA is a statute with a stated purpose of "[e]stablishing criteria, nutrient management planning requirements[,] and an implementation schedule for the application of nutrient management measures on certain agricultural operations which generate or utilize animal manure." 3 P.S. § 1702. With respect to preemption by the Nutrient Management Act (NMA), each side argues its position in extremely conclusory terms. Synagro contends that because it alleges that the NMA as a matter of law preempts the Ordinance, its claim should be sustained. According to Synagro, the application of sewage sludge is regulated under this statute. *See* 3 P.S. § 1703. Both Synagro and Rush Township point to the following clause, which comments on the NMA's preemptive force:

This act and its provisions are of Statewide concern and occupy the whole field of regulation regarding nutrient management to the exclusion of all local regulations. Upon adoption of the regulations authorized by section 4, no ordinance or regulation of any political subdivision or home rule municipality may prohibit or in any way regulate practices related to the storage, handling or land application of animal manure or nutrients or to the construction, location or operation of facilities used for storage of animal manure or nutrients or practices otherwise regulated by this act if the municipal ordinance or regulation is in conflict with this act and the regulations promulgated thereunder. Nothing in this act shall prevent a political subdivision or home rule municipality from adopting and enforcing ordinances or regulations which are consistent with and no more stringent than the requirements of this act and the regulations promulgated under this act, provided, however, that no penalty shall be assessed under any such local ordinance or regulation for any violation for which a penalty has been assessed under this act.

3 P.S. § 1717. Essentially, this clause states that while a municipality is prohibited from enacting regulation of animal manure that is inconsistent with the NMA, it may enact an ordinance that is consistent with the state statute. Synagro alleges

that because the Ordinance regulates the storage, handling, and land application of sewage sludge (which is regulated by the NMA), it is preempted by the NMA. Rush Township states in conclusory terms that because the Ordinance is consistent with the NMA, there is no preemption, and Synagro's claim should be dismissed. Rush Township points to no other provisions of either the Ordinance or the NMA, and it fails to offer anything other than a rudimentary assertion that the Ordinance is consistent with the NMA. These statements do not sustain Rush Township's burden to show that Synagro has not stated a claim. Accordingly, this claim will be sustained.

### 2. Solid Waste Management Act (SWMA)

The SWMA is a statute that was enacted to establish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive solid waste management. In part by requiring permits for the operation of municipal waste processing and disposal systems, it purportedly protects the public health, safety and welfare from the short and long term dangers of transportation, processing, treatment, storage, and disposal of all wastes. 24 Summ.Pa.Jur.2d Environmental Law § 4:7 (2001). Synagro states that because it alleges that the SWMA preempts the Ordinance, its claim should be sustained. In its brief, it contends that because the SWMA grants the DEP and not municipalities the power to regulate solid waste management, it preempts local regulation. Rush Township's primary argument is that because the SWMA does not *expressly* preempt local regulation, local regulation is allowed. At this stage of the proceedings, and based on Rush Township's insufficient arguments, we are not convinced that Synagro's claim is totally without merit. Thus, this claim will be sustained.

### 3. Sewage Facilities Act (SFA)

The purpose of the SFA is "[t]o protect the public health, safety and welfare of its citizens through the development and implementation of plans for the sanitary disposal of sewage waste." 35 P.S. § 750.3. The SFA requires municipalities to submit to Pennsylvania's Department of Environmental Resources an officially adopted plan for sewage services for areas within its jurisdiction. After approval, the municipality is responsible for carrying out the plan. 35 P.S. § 750.5. In support of its preemption argument, Synagro cites the case of *Greater Greensburg Sewage Auth. v. Hempfield Twp.*, 5 Pa. Cmwlth. 495, 291 A.2d 318 (1972), in which the Pennsylvania Commonwealth Court held that the SFA preempted an ordinance that regulated a sewage treatment plant and required the sewage authority to obtain a license prior to the disposal of the sludge resulting from the operation of the treatment plant. According to the court the SFA "resulted in a limited preemption of the field of regulation of sewage facility operations, including the disposal of the 'sludge' from such operations." *Id.* at 321. Rush Township does little to discredit Synagro's preemption argument. It simply cites a case—albeit one decided by the Pennsylvania Supreme Court—that held that the enactment of the SFA was not an indication that the General Assembly preempted the sewage field. *See Council of Middletown Twp., Delaware County v. Benham,* 514 Pa. 176, 523 A.2d 311, 313 (1987). While *Benham* may support Rush Township's arguments in a general sense, the challenged regulation in *Benham* was a zoning ordinance, *id.* at 312, while Rush Township's ordinance regulates the application of sewage sludge to mine sites. If Rush Township wished for the court to dismiss the preemption claim at this stage, it should have tailored its arguments to the statute in question. Rush Township fails

to show that Synagro has not asserted a valid preemption claim.

### Count VIII: Contracts Clauses

■ Synagro raises claims under the Contracts Clauses of the United States Constitution and the Pennsylvania Constitution. It challenges § 10 of the Ordinance, which states that the provisions of the Ordinance apply to all existing permits issued or authorized by the Pennsylvania DEP. According to Synagro, this provision is unreasonable and unduly interferes with the vested rights of parties undertaking existing permitted mine reclamation projects.

The Contracts Clause of the United States Constitution provides that "[n]o state shall enter into any . . . Law impairing the Obligation of Contracts." U.S.C. Const. Art. 1, § 10. Similarly, the Contracts Clause of the Pennsylvania Constitution provides that "[n]o . . . law impairing the obligation of contracts . . . shall be passed." Pa. Const. art. I, § 17. The two Contract Clauses are analyzed identically. *First National Bank of Pennsylvania v. Flanagan*, 515 Pa. 263, 528 A.2d 134, 135 n. 1 (1987). Accordingly, we will refer to Synagro's claims as falling under the "Contracts Clauses."

■ "In order to prove a violation of [the Contracts Clauses], a plaintiff must demonstrate that a change in state law has operated as a substantial impairment of a contractual relationship." *Transport Workers Union of America, Local 290 v. Southeastern Pennsylvania Transportation Authority*, 145 F.3d 619, 621 (3d Cir. 1998) (citations and internal quotation marks omitted). "Contract Clause analysis requires three threshold inquiries: (1) whether there is a contractual relationship; (2) whether a change in a law has impaired that contractual relationship; and (3) whether the impairment is substantial." *Id.* (citing *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)). "If it is determined that a substantial impairment of a contractual relationship has occurred, the court must further inquire whether the law at issue has a legitimate and important public purpose and whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." *Id.* (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412–13, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)).

■ "If the impaired contractual relationship is between private parties, the court will defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued." *Id.* (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412–13, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)). In other words, "unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Keystone Bituminous Coal Assoc. v. DeBenedictis*, 480 U.S. 470, 505, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (citations and internal quotation marks omitted); *see also Transport Workers Union*, 145 F.3d at 621–22 (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)).

The complaint alleges that "[c]ompliance with the Ordinance would create unreasonable and onerous delay and expense, upset contractual relations between municipal sludge generators and Synagro, as well as compromise the ability of the mine operator to satisfy permit obligations to timely reclaim the site in accordance with the approved reclamation plan." (Complaint at § 125.) Synagro argues that because it alleged the elements of a Contracts Clause

claim, its claim should be sustained. Rush Township asserts that the Ordinance was passed to protect the health and safety of its citizens from the dangers of sewage sludge, and it contends that any possible substantial impairment of Synagro's rights is reasonable. Synagro argues that the court is not entitled to accept Rush Township's purported reason and that discovery should be taken to discover the true purpose behind the statute.

What Rush Township points out—and what Synagro fails to address—is that because Rush Township is not a party to the allegedly impaired contracts, we "should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *DeBenedictis,* 480 U.S. at 505, 107 S.Ct. 1232. Rush Township claims that the Ordinance was enacted to protect the health and safety of its citizens, and in light of the fact that the purportedly impaired contracts involve only private parties, we are compelled to defer to Rush Township's asserted justification. Even if Synagro's contractual obligations are substantially impaired, the Ordinance must survive challenges under the Contracts Clauses because it has a legitimate and important public purpose. Accordingly, Synagro's claims under the Contract Clauses will be dismissed.

### Count IX: Ultra Vires

Synagro's final claim is that the Ordinance is an Ultra Vires Action. According to Synagro, the $40–per–ton "fee" on the dumping of sewage sludge is in reality a tax that Rush Township, as a second-class Township in Pennsylvania, lacked the authority to pass. In its brief seeking dismissal of the claim, Rush Township states that it enacted the Ordinance under (1) its power to adopt safety regulations; (2) its power to charge business licensing fees; and (3) its power to charge reasonable fees for the collection, removal, and disposal of solid waste. Nowhere does it address Synagro's theory that the fee is in actuality a prohibited tax. Although Synagro's allegations are essentially legal conclusions that we need not accept, Rush Township has not at this point in the proceedings sustained its burden to show that the claim is without merit. Thus, the ultra vires claim will stand for the moment.

### More Definite Statement

Rush Township also has filed a 12(e) motion for more definite statement. In the complaint, Synagro describes itself as a "successor in interest" to a company called Wheelabrator Water Technologies, and it states that its "predecessor" was the Bio Gro division of that company. (Complaint at ¶ 5.) Rush Township seeks to have Synagro file a statement that clarifies the legal relationship between Synagro and the Bio Gro Division of Wheelabrator.

A motion for under Rule 12(e) for a more definite statement "will be granted only if a pleading is so vague or ambiguous that the opposing party cannot reasonably be required to make a responsive pleading." *SEC v. Saltzman,* 127 F.Supp.2d 660, 668 (E.D.Pa.2000) (citations and internal quotation marks omitted). "Motions for a more definite statement are generally disfavored, and should [be granted only] if a pleading is unintelligible, making it virtually impossible for the opposing party to craft a responsive pleading." *Sabugo–Reyes v. Travelers Indemnity Co. of Illinois,* No. CIV.A. 99–5755, 2000 WL 62627, at *3 (E.D.Pa. January 14, 2000) (citing Frazier v. SEPTA, 868 F.Supp. 757, 763 (E.D.Pa.1994)).

The complaint provides enough detail for Rush Township to file a responsive pleading; indeed, in its motion to dismiss, Rush Township satisfactorily attacks every one of Synagro's claims without the benefit of the legal relationship between Synagro and the Bio Gro Division of Wheelabrator.

Rush Township may garner any other required information through the discovery process. Its motion for more definite statement will be denied.

## CONCLUSION:

Rush Township's motion to dismiss will be granted in part and denied in part, and its motion for more definite statement will be denied. Synagro's remaining claims are that the Ordinance violates the Commerce Clause, that the Ordinance is preempted by the NMA, the SWMA, and the SFA, and that the enactment of the Ordinance was an ultra vires action. An appropriate order follows.

### ORDER

For the reasons stated in the accompanying memorandum,

**IT IS ORDERED THAT:**

1. Defendant Rush Township, Pennsylvania's motion to dismiss and for a more definite statement (Rec.Doc. No. 4) is granted in part and denied in part.

1.1. Counts I, II, III, V, VI, and VIII are dismissed.

1.2. Counts IV, VII, and IX remain.

2. Synagro's remaining claims are that the Ordinance violates the Commerce Clause; that the Ordinance is preempted by the Nutrient Management Act, the Solid Waste Management Act, and the Sewage Facilities Act; and that the enactment of the Ordinance was an ultra vires action.