SYNAGRO–WWT, INC., Plaintiff,

v.

RUSH TOWNSHIP, PENNSYLVANIA, Defendant.

No. 4:CV–00–1625.

United States District Court, M.D. Pennsylvania.

Dec. 22, 2003.

James B. Slaughter, David W. Wagner, Beveridge & Diamond, P.C., Washington, DC, Robert E. Thomas, Kaminsky, Thomas, Wharton & Lovette, Johnstown, PA, for Synagro–WWT, Inc., Plaintiff.

David J. MacMain, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, George Test, Killian & Gephart, LLP, Michael J. O'Connor, Killian & Gephart, LLP, Paula J. McDermott, Duane Morris LLP, Thomas W. Scott, Killian & Gephart, Harrisburg, PA, for Rush Township, Pennsylvania, Defendant.

## *MEMORANDUM*

MCCLURE, District Judge.

### *BACKGROUND:*

Plaintiff, Synagro–WTT, Inc. (Synagro), initiated this civil action against defendant, Rush Township, Pennsylvania, to challenge the validity of a municipal ordinance (the Ordinance) enacted by defendant. The Ordinance imposes certain requirements on companies wishing to transport and to apply sewage sludge to lands within the township.

Plaintiff sought a declaratory judgment that the Ordinance was preempted by various federal and state statutes, an injunction against the enforcement of the Ordinance, and damages. Plaintiff specifically alleged that: (1) the Ordinance is preempted by the federal Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201–1328 (Count I); (2) the Ordinance is preempted by the Pennsylvania Surface Mining Conservation and Reclamation Act (PaSMCRA), 52 P.S. §§ 1396.1–1396.31 (Count II); (3) the Ordinance violates the Due Process Clause of the United States Constitution (Count III); (4) the Ordinance violates the Commerce Clause of the

United States Constitution (Count IV); (5) the Ordinance violates the Equal Protection Clause of the United States Constitution (Count V); (6) the Ordinance violates the Uniformity Clause of the Pennsylvania Constitution (Count VI); (7) the Ordinance is preempted by three other Pennsylvania statutes: the Nutrient Management Act (NMA), 3 P.S. § 1701 *et seq.*, the Solid Waste Management Act (SWMA), 35 P.S. § 6018.101 *et seq.*, and the Sewage Facilities Act (SFA), 35 P.S. § 750.1 *et seq.* (Count VII); (8) the Ordinance violates the Contract Clauses of the United States and Pennsylvania Constitutions (Count VIII); and (9) the enactment of the Ordinance was an ultra vires action (Count IX).

Defendant moved to dismiss plaintiff's complaint and alternatively moved for a more definite statement, and also requested that the court abstain from deciding the state law preemption issues. On June 7, 2002, the court denied defendant's request to abstain and request for a more definite statement. The court did, however, partially grant defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and disposed of a number of plaintiff's claims. *See Synagro–WWT, Inc. v. Rush Township, Pennsylvania*, 204 F.Supp.2d 827, 850 (M.D.Pa.2002). Following the court's June 7th ruling, only the following counts remained: (1) whether the Ordinance violates the Commerce Clause (Count IV); (2) whether three Pennsylvania statutes, NMA, SWMA, SFA, preempt the Ordinance (Count VII); and (3) whether the enactment of the Ordinance was an ultra vires action (Count IX).

Prior to the court's ruling, plaintiff had moved for partial summary judgment on the preemption issues raised in Counts I, II, and VII. As Counts I and II have been dismissed, only Count VII remains the subject of plaintiff's motion. In its opposition to plaintiff's motion, defendant cross-moved for summary judgment as well. These cross-motions for partial summary judgment are now before the court, and are fully briefed by the parties as well as by numerous amici curiae.

We continue to have both federal question and diversity jurisdiction. *See* 28 U.S.C. §§ 1331, 1332.

## DISCUSSION:

### I. Statement of Relevant Facts

The parties are familiar with the facts of this case, so we only briefly recite the relevant, material facts, which we have previously set forth in *Synagro–WWT, Inc. v. Rush Township, Pennsylvania (Synagro)*, 204 F.Supp.2d 827 (M.D.Pa. 2002).

Plaintiff is in the business of managing treated municipal sewage sludge (or "biosolids") for municipal treatment plants throughout the United States. Among plaintiff's services is the land application of sewage sludge to surface mine reclamation sites.

In Pennsylvania, the application of biosolids to land sites is overseen by the Pennsylvania Department of Environmental Protection (DEP). "Synagro has 5 sites in Rush Township that are permitted for mine reclamation with biosolids. Synagro received from the DEP all of the necessary permits and approvals required for it to apply biosolids to the sites. At the time Synagro filed its complaint, certain sites had yet to be reclaimed." *Synagro*, 204 F.Supp.2d at 833.

"After Synagro began biosolids application in one of its land sites, Rush Township enacted the Land Application of Sewage Sludge Ordinance. The Ordinance's stated purpose is '[t]o protect the health, safety and general welfare of all township citizens and other persons by seeking to prevent exposure to any toxic or other harmful material contained in sewage sludge

....' " (Ordinance, Attached to Compl., Rec. Doc. No. 1, at § 1.1(A).) The Ordinance applies to "all current existing permits issued or authorized by PA DEP for the land application of sewage sludge in Rush Township. (*Id.* at § 10.)" *Synagro,* 204 F.Supp.2d at 833.

"The Ordinance claims to be consistent with federal and state regulation of sewage sludge, but it sets forth additional preliminary procedural requirements of any entity that wishes to apply sewage sludge in Rush Township. Before sewage sludge may be applied in Rush Township, two documents must be obtained. First, the wastewater treatment facility that generates the sewage sludge must obtain a 'Site Registration,' which is a document that confirms that the proposed site meets all federal, state, and local regulations pertaining to the application of sewage sludge. Second, the entity applying the sewage sludge must obtain a 'Land Application Registration,' which is an authorization by Rush Township to apply sewage sludge on agricultural lands within the township." *Id.*

"The Ordinance mandates a considerable number of procedural requirements for obtaining a Site Registration and a Land Application Registration. An applicant must submit all DEP application material to Rush Township for review and consideration. In addition, the applicant must subject the featured land to many tests, including soil analysis and groundwater analysis. After completing the tests, the applicant must provide Rush Township with reports based on these tests. The applicant also must submit documents such as a map of the surface waters on the proposed site and a memorialization of a county-approved plan to manage surface water and control erosion on the site." *Id.*

"In addition to prescribing requirements for obtaining Site Registration and a Land Application Registration, the Ordinance regulates the transportation of sewage sludge. For example, the Ordinance requires that sewage sludge may be transported within Rush Township only from the hours of 6:00 AM to dusk, Monday through Friday." *Id.*

"The provisions of the ordinance are enforced by the Rush Township Board of Supervisors. An amendment to the ordinance, enacted on November 4, 1999, requires a tipping fee of $40.00 per ton of sewage sludge applied upon any land in Rush Township."[1] *Id.*

"Synagro claims that the requirements imposed by the Ordinance have, among other things, forced it to find land sites in other Townships; it alleges in excess of $2,560,000 in damages." *Id.*

## II. Standard of Review

Summary judgment is appropriate if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beers–Capitol v. Whetzel,* 256 F.3d 120, 130 n. 6 (3d Cir.2001).

An issue is "genuine" if a reasonable jury could find for either party. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "Material" facts are those that might af-

---

1. The amendment added a new § 8 to the Ordinance, and renumbered the original §§ 8–11 accordingly. For clarity, we will refer to the amendment's new § 8 as "Amendment, § 8," and refer to the other sections of the Ordinance as originally numbered (i.e., § 8 of the Ordinance will continue to be referred to as "Ordinance, § 8").

fect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505.

Initially, the moving party bears the burden of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "It can discharge that burden by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party points to evidence demonstrating that no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable fact-finder could rule in its favor. *Ridgewood Bd. of Educ. v. N.E, ex rel. M.E.,* 172 F.3d 238, 252 (3d Cir.1999) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Although "[s]peculation and conclusory allegations do not satisfy this duty," *Ridgewood,* 172 F.3d at 252 (citing *Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir.1995)), all inferences are made in a light most favorable to the nonmoving party. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Carter v. Exxon Co. USA,* 177 F.3d 197, 202 (3d Cir.1999).

### III. Standing

Preliminarily, we comment that plaintiff has correctly observed that the court implicitly found that plaintiff has standing to seek a declaratory judgment on the issue of preemption. We now make this point explicit.

"Constitutional standing requires pleadings that show (1) a legally recognized injury; (2) caused by the named defendant or at least fairly traceable to the challenged action of the defendant; and (3) that a favorable decision by the court would likely redress." *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 561 (3d Cir.2002) (quotations and citation omitted). Plaintiff satisfies all three criteria. Plaintiff shows a recognizable injury in it's being unable to proceed with its business activity. Defendant also argues that plaintiff lacks standing because plaintiff failed to produce any current DEP permits, a point emphasized by defendant in a recent letter that it sent to the court on December 16, 2003. Defendant's argument is unavailing because, under the Ordinance, plaintiff could apply for local permits first, (*see* Ordinance, § 4.1), which simply remain ineffective until the DEP grants a permit as well. *Cf. Hydropress Envtl. Services, Inc. v. Township of Upper Mount Bethel,* 836 A.2d 912, 916–17 (Pa. 2003) (plurality, yet six justices concurring on sewage sludge processing company's standing to challenge municipal ordinance). Besides, at the time the Ordinance was enacted, plaintiff possessed valid DEP permits.

Plaintiff also demonstrates a causal connection between the Ordinance and the alleged harm because the enactment of the Ordinance, an ordinance that might in fact be preempted by state law, is the source of plaintiff's injury. *Cf. Lauderbaugh v. Hopewell Township,* 319 F.3d 568, 575 (3d Cir.2003) (upholding standing to challenge zoning ordinance on preemption grounds). Last, a favorable decision by the court would provide plaintiff redress in the form of it's being able to resume its normal business activity. *Cf. Hydropress,* 836 A.2d 912, 916–17. Thus, plaintiff has standing to seek a declaratory judgment with regards to the issue of preemption.

### IV. Analyzing the Three Statutes

The Pennsylvania Supreme Court has stated that state statutes address the issue

of preemption in three ways. State statutes can either: (1) expressly specify that municipalities may enact ordinances not inconsistent with the state law that promote the state law's purpose; (2) expressly forbid municipal legislation; or (3) be silent on the issue of preemption while regulating an industry or occupation. *Mars Medical Services, Inc. v. Township of Adams*, 559 Pa. 309, 740 A.2d 193 (1999) (referencing *W. Pennsylvania Rest. Ass'n v. Pittsburgh*, 366 Pa. 374, 77 A.2d 616, 619–20 (1951)).

Even with the third type of state legislation, when a state statute is silent on the issue of preemption, municipal regulation is prohibited and therefore considered preempted if it is contradictory or inconsistent with the state law. *Mars*, 740 A.2d at 195. The municipal regulation may stand however, even if it imposes regulations in addition to those provided for by state law, so long as it is reasonable and is necessary to aid and further the purpose of the state law. *Id.* The extent to which municipal regulation overlaps but does not conflict with state law is a matter of municipal and state legislative intent. *Id.*

In trying to divine legislative intent, lower Pennsylvania courts typically ask the following five questions when determining if a state statute preempts a municipal regulation or ordinance:

(1) Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is, does the ordinance forbid what the legislature has permitted? (2) Was the state law intended expressly or impliedly to be exclusive in the field? (3) Does the subject matter reflect a need for uniformity? (4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? (5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature?

*Klein v. Straban Township*, 705 A.2d 947, 949–50 (Pa.Cmwlth.1998) (citing *Duff v. Township of Northampton*, 110 Pa. Cmwlth. 277, 532 A.2d 500, 505 (Pa. Cmwlth.1987)). We add as a final note that the Pennsylvania Supreme Court recognizes that "the consequences of preemption are severe" and that it has " 'found an intent to totally preempt local regulation in only three areas: alcoholic beverages, anthracite strip mining, and banking.' " *Hydropress*, 836 A.2d 912, 917–18 (quoting *Council of Middletown Township v. Benham*, 514 Pa. 176, 523 A.2d 311, 314 (1987)).

With this framework in mind, we proceed to analyze whether plaintiff rightly contends that the Ordinance is preempted by NMA, SWMA, and/or SFA.

### A. NMA

The cardinal purpose of the NMA is to "establish criteria, nutrient management planning requirements[,] and an implementation schedule for the application of nutrient management measures on certain agricultural operations which generate or utilize animal manure." 3 P.S. § 1702. Of the three classes of statutes described in *Mars*, NMA falls within the first class because it expressly permits consistent, no more stringent municipal regulations. The pertinent section reads:

This act and its provisions are of Statewide concern and occupy the whole field of regulation regarding nutrient management to the exclusion of all local regulations. Upon adoption of the regulations authorized by section 4, no ordinance or regulation of any political subdivision or home rule municipality may prohibit or in any way regulate practices related to the storage, handling or land application of animal manure or nu-

trients or to the construction, location or operation of facilities used for storage of animal manure or nutrients or practices otherwise regulated by this act if the municipal ordinance or regulation is in conflict with this act and the regulations promulgated thereunder. Nothing in this act shall prevent a political subdivision or home rule municipality from adopting and enforcing ordinances or regulations which are consistent with and no more stringent than the requirements of this act and the regulations promulgated under this act, provided, however, that no penalty shall be assessed under any such local ordinance or regulation for any violation for which a penalty has been assessed under this act.

3 P.S. § 1717. As we observed earlier, "[e]ssentially, this clause states that while a municipality is prohibited from enacting regulation of animal manure that is inconsistent with the NMA, it may enact an ordinance that is consistent with the state statute." 204 F.Supp.2d at 846.

Plaintiff would have us believe that NMA preempts the Ordinance because the latter regulates sewage sludge, which is included within NMA's definition of "nutrient." 3 P.S. § 1702. NMA, though, only regulates nutrients with respect to "certain *agricultural operations* which generate or utilize animal manure." 3 P.S. § 1702(1) (emphasis added). A number of NMA provisions further illustrate that NMA's regulation of nutrients only pertains to their use in connection with agricultural operations. *See, e.g.,* 3 P.S. § 1702(2) ("... to provide outreach to the agricultural community on the proper utilization and management of nutrients *on farms* ...") (emphasis added); 1702(3) ("... to develop and provide technical and financial assistance for nutrient management and alternative uses of animal manure, including a manure marketing and

distribution program."); § 1706(b) ("The operator of any *concentrated animal operation* shall develop and implement a nutrient management plan ...") (emphasis added); § 1714(a) ("A duly authorized agent of the commission or a conservation district shall have authority to enter *any agricultural operation* ...") (emphasis added). The legislative history on NMA also suggests that the statute aims to regulate nutrients used in agricultural operations:

> One area that I would also like to stress is that on the preemption language ... I believe that we now have language that truly does preempt local ordinances and give the *agricultural operations* in Pennsylvania the kind that they need.
>
> We also were able to put language in the bill that I believe genuinely allows for the kind of flexibility that *farmers* need in their normal management practices as it relates to crop rotation and the other kinds of decisions that they would make .... [I]n no way should there be any reason for this bill to interfere with the normal management decision that *farmers* would make in the course of operating their business.

*House Legislative Journal,* Feb. 2, 1993, p. 119 (remarks of Rep. Barley) (emphasis added).

■ No one contends that plaintiff is engaged in agricultural operations. Nor do plaintiff's surface mine reclamation activities at issue in this case fall within NMA's definition of agricultural operations. *See* 3 P.S. § 1703. Accordingly, if NMA does not regulate plaintiff's activities, it cannot preempt the municipal regulation of those activities.

Plaintiff points out, though, that defendant cites NMA as "additional authority" for enacting the Ordinance. (*See* Ordinance, § 3.1(J).) Indeed, the Ordinance

does purport to regulate the use of sewage sludge in agricultural operations (*see, e.g.,* Ordinance, §§ 1.3, 3.1,), which is within NMA's purview. Plaintiff might be correct that the provisions of the Ordinance which regulate agricultural operations may be inconsistent with, and therefore preempted by, NMA.

Unfortunately for plaintiff, it does not challenge the Ordinance as it applies to agricultural operations, but only to the extent that it regulates its land application of sewage sludge to mine reclamation sites. Consequently, we have no occasion to consider the extent to which NMA would preempt the Ordinance insofar as it regulates agricultural operations. For purposes of the instant action, it suffices for us to conclude simply that NMA does not preempt the Ordinance to the extent that the Ordinance regulates the land application of sewage sludge in connection with non-agricultural operations, such as plaintiff's.

### B. SWMA

Among the state legislature's many goals behind enacting SWMA was a desire to protect the public health, safety, and welfare from the harms caused by "improper and inadequate solid waste practices." 35 P.S. § 6018.102. To this end, SWMA provides for an intricate regulatory scheme for the management, "transportation, processing, treatment, storage and disposal of all wastes," through "a cooperative State and local program of planning." 35 P.S. §§ 6018.102(1)-(4); *see* 35 P.S. §§ 6018.106, .201, .504, .604(b), .607.

In the recent *Hydropress* plurality opinion, three Pennsylvania Supreme Court Justices succinctly concluded in a one-paragraph statement that SWMA's provisions are "the language of intergovernmental coordination and cooperation, not of preemption." 836 A.2d 912, 918–19. They therefore declined to find that SWMA preempted a municipal ordinance requiring permits for the beneficial use of waste. Rather they found, and three more Justices concurred, that the municipality lacked the power to enact certain provisions that charged road users for road improvements and that required those beneficially using waste to obtain permits first.[2] *Id.* at 919–21.

Three Justices dissented from the lead opinion on the preemption issue. Instead of invalidating portions of the ordinance solely on the ground that the enactment of these portions was an ultra vires action, the three dissenters would have held that "SWMA preempts *any* local regulation of the land application of waste material such as biosolids, septage, or sewage sludge." 836 A.2d 912, 920–21.[3]

Because *Hydropress* is a plurality opinion, at least with respect to the preemption issue, it is without force of weight as controlling authority. *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 843 n. 13 (2003). We must therefore consider the preemption issue anew, guided by "decisional law of lower state courts." *Hittle v. Scripto–Tokai Corp.,* 166 F.Supp.2d 159, 161 (M.D.Pa.2001).

Unlike NMA, SWMA lacks a general statement on preemption. *See Council of Middletown Township, Delaware County*

---

**2.** Incidentally, a fair reading of *Hydropress* suggests that six Justices agree that municipalities lack the power to require "permits to engage in the beneficial use or processing of municipal or residual waste." 836 A.2d 912, 2003 WL 22799700, at *6–7.

**3.** The seventh Justice believed that the waste processor lacked standing to challenge the ordinance in the first instance.

*v. Benham,* 514 Pa. 176, 523 A.2d 311, 313 (1987) (commenting that state legislature did not intend to preempt the entire field of waste regulation covered by SWMA). As it is silent on the issue of preemption, SWMA falls within the third category of legislation described in *Mars.* We therefore analyze whether the Ordinance is inconsistent or in conflict with SWMA. *See Mars,* 740 A.2d at 195.

We first acknowledge that this court has stated on another occasion that "[w]hen the land use in question is the management or disposal of solid waste, most local ordinances are preempted by [SWMA]." *Phoenix Resources, Inc. v. Duncan Township,* 155 F.R.D. 507, 513 (M.D.Pa.1994). Many lower Pennsylvania courts have similarly held that SWMA preempts municipal ordinances that attempt to regulate the operational aspects of waste disposal facilities. *See, e.g., Abbey v. Zoning Hearing Bd. of the Borough of E. Stroudsburg,* 126 Pa.Cmwlth. 235, 559 A.2d 107, 112 (1989) (distinguishing locality's inability to regulate how facility operates, as opposed to where facility may be located); *S.E. Chester County Refuse Auth. v. Bd. of Supervisors of London Grove Township,* 545 A.2d 445, 446 (Pa.Cmwlth.1988) (permitting locality to limit landfill height, to order ceasing of operations if water supply contamination occurs, to ensure adequate public roads, and to require facility to have insurance); *see also, e.g., Hancock Indus. v. Schaeffer,* 811 F.2d 225, 234 (3d Cir.1987) (referencing *Municipality of Monroeville v. Chambers Dev. Corp.,* 88 Pa.Cmwlth. 603, 491 A.2d 307 (Pa.Cmwlth.1985)); *Stewart v. Zoning Hearing Bd. of Radnor Township,* 110 Pa.Cmwlth. 111, 531 A.2d 1180, 1182 (Pa.Cmwlth.1987); *Township of Plymouth v. County of Montgomery,* 109 Pa.Cmwlth. 200, 531 A.2d 49, 54 (Pa. Cmwlth.Ct.1987); *Municipality of Monroeville v. Chambers Dev. Corp.,* 88 Pa. Cmwlth. 603, 491 A.2d 307, 310 (Pa.

Cmwlth.1985); *Greater Greensburg Sewage Auth. v. Hempfield Township, Westmoreland County,* 5 Pa.Cmwlth. 495, 291 A.2d 318, 321 (Pa.Cmwlth.1972).

■ All of these cases make plain that a municipality cannot impose regulatory hurdles, over and above those imposed by SWMA and DEP regulations, that would impede the day-to-day operations of a waste facility. Although municipal regulations are permissible if they further the goals of SWMA, such regulations cannot impose onerous requirements that stand as obstacles "to the accomplishment and execution of the full purposes and objectives of the legislature." *Klein,* 705 A.2d at 949–50; *Duff,* 532 A.2d at 505.

■ Given this background, we first find that the provisions of the Ordinance which require plaintiff to obtain a local Land Application Registration (LAR) prior to the land application of sewage sludge are preempted by SWMA. This requirement is not only duplicative of the DEP's permit system, but is a substantial obstacle to SWMA's goal of orderly and efficient land application of sewage sludge.

The Ordinance requires a LAR prior to the land application of sewage sludge. It defines land application as: "The spraying of sewage sludge onto the land surface for beneficial use; the injection of sewage sludge below the land surface for beneficial use; or the incorporation of sewage sludge into the solid for beneficial use so that the sewage sludge can either condition the soil or fertilize crops for vegetation grown in the soil." (Ordinance, § 2). This definition tracks the DEP's definition. *See* 25 Pa.Code § 271.907.

The DEP requires that a land applier of sewage sludge first obtain a "land application of sewage sludge permit." DEP regulations define "land application of sewage sludge permit" as a "[a] permit that is

issued for an activity related to the land application of sewage sludge which may result in a discharge of pollutants to waters of this Commonwealth." 25 Pa.Code § 271.907. The Ordinance requires all land appliers of sewage sludge to obtain a LAR in addition to obtaining a DEP permit prior to the land application of sewage sludge. The Ordinance defines its LAR requirement as "authorization to land apply sewage sludge on agricultural lands in Rush Township." (Ordinance, § 1.2.)

Juxtaposing the DEP permit and local LAR requirement reveals that the DEP permit definition is broader than the LAR definition. The DEP's permit amounts to state authorization to engage in any activity related to the land application of sewage sludge. *See* 25 Pa.Code § 271.907. The Ordinance's LAR requirement, however, is defined as authorization for applying sewage sludge *on agricultural lands* only. (*See* Ordinance, § 1.2.)

The term "agricultural land" is specially defined by the DEP as "[l]and on which a food crop, a feed crop, a fiber crop, a silvacultural crop or a horticultural crop is grown. The term includes range land and land used as pasture." 25 Pa.Code § 271.907. By its terms, the Ordinance specifically incorporates this definition, among others: "The Federal and State Governments have established regulations for the land application of sewage sludge. These regulations have been incorporated into this Ordinance." (Ordinance, § 1.2.)[4]

The Ordinance's LAR requirement is hopelessly contradictory. On the one hand, the Ordinance states that a LAR is a necessary prerequisite for the application of sewage sludge to agricultural land. (*See* Ordinance, § 1.2) On the other hand, the Ordinance goes on to require that all land appliers of sewage sludge obtain a LAR, even those who only apply sewage sludge to non-agricultural lands. The drafters of the Ordinance must have contemplated the special meaning attached to "agricultural land" because that term was not used elsewhere in the Ordinance. (*See, e.g.,* Ordinance § 1.1(b) (stating purpose of Ordinance is to preserve the quality of "all land"); § 1.3 (referring simply to "land" or "the land").)

As we noted in our discussion of NMA, *supra* Part IV.A, plaintiff's operations involve the application of sewage sludge to surface mine reclamation sites, not to agricultural lands. Surface mine reclamation sites are not agricultural lands. Indeed, it is the expectation that the application of sewage sludge to surface mine reclamation sites will simply fill mines and facilitate natural vegetative growth on the surface of the site, not foster agricultural development. (*See, e.g.,* Pl.'s Exs. Compendium to Br. Supp. Mot. Partial Summ. J., Rec. Doc. No. 19, Ex. 6.e, at 4, "coal refuse disposal permit".)

By flatly requiring a LAR from all entities that land apply sewage sludge, when the LAR is purportedly required only for application of sewage sludge to agricultural lands, the LAR requirement amounts to "an obstacle to the accomplishment and execution of the full purposes and objectives of [SWMA]." *Klein,* 705 A.2d at 949–

4. Even had defendant not incorporated the DEP's definition of agricultural land, the common meaning of the word "agricultural" would yield a meaning substantially similar to that given to it by the DEP. The common meaning of "agricultural" is: "Pertaining to, or dealing with, agriculture; characterized by or engaged in farming as the leading pursuit." *Black's Law Dictionary* 68 (6th ed.1990). "Agriculture," in turn, means "[t]he science or art of cultivating soil, harvesting crops, and raising livestock." *Black's Law Dictionary* 69 (7th ed.1999). Thus, even absent the DEP definition, agricultural land would mean land used for soil cultivation, crop growing, and livestock raising.

50. Namely, the LAR requirement is an unnecessary requirement that plaintiff is forced to obtain, impeding SWMA's goal of facilitating the orderly and efficient transportation, processing, treatment, and disposal of waste.

We therefore rule that all references in the Ordinance to the LAR requirement are preempted by SWMA and the corresponding DEP regulations. This includes, but is not limited to: (i) Section 1.1(D) (mandating compliance with LAR requirement); (ii) Section 4 (requiring a valid LAR prior to land application of sewage sludge); (iii) Sections 5.3, 5.3.1 (outlining LAR prerequisites); (iv) Section 6(C) (requiring operator of hauling vehicle to have copy of LAR); (v) Sections 7.2, 7.3(A) (mandating inspection to ensure compliance with the LAR and imposing penalties for noncompliance with the LAR); (vi) Sections 8.1, 8.2 (relating to enforcement of LAR); and (vii) Section 9.2(A) (outlining Township Board of Supervisor's role in reviewing and processing applications for LARs). Further, all provisions pertaining to the testing of inbound sewage sludge are incident to ongoing compliance with the LAR requirement. Accordingly, these provisions, namely all of those in Amendment § 8, are also preempted.

We next proceed to review plaintiff's challenges to other aspects of the Ordinance. Having reviewed plaintiff's challenges, we find that only one other provision is preempted.

■ Among the Ordinance's stated purposes of § 1 is the peculiar requirement of § 1.3, which mandates that "[s]oil pH shall be 6.0 or greater prior to the land application and shall be maintained at 6.0 or greater for the life of land application operations and for two additional years following the last application of sludge to the site." A DEP regulation directly on point, however, reads: "A person may not apply sewage sludge unless the soil pH is 6 or greater prior to land application unless the Department allows the increase of pH by application of sewage sludge or other material in which case the soil pH shall be 6 or greater within six months following the application of sewage sludge, or unless otherwise approved in writing by the Department." 25 Pa.Code § 271.915(e). The Ordinance would prohibit pH levels that may be excepted by the DEP. It is therefore in conflict with the applicable DEP regulation, meaning that this requirement is preempted.

We realize that the only major substantive requirement that survives our preemption analysis is the Site Registration requirement. Besides taking issue with the prerequisites for Site Registration (*see* Ordinance §§ 5.1.1(A)-(I)), plaintiff particularly takes issue with the Ordinance's enforcement provisions as they pertain to the Site Registration requirement. (*See* Ordinance, §§ 6–8.) Plaintiff contends that these provisions are worded too broadly.

■ We first note that Site Registration prerequisites that plaintiff claims are in conflict with SWMA or DEP regulations are insufficiently contradictory to justify preemption. These provisions mostly call for tests and monitoring that are not at odds with SWMA or DEP regulations. For instance, provisions mandating groundwater tests by qualified hydrologists, and regulating the hours within which the transportation of sewage sludge may occur, are consistent with SWMA's goal of protecting the public health, safety, and welfare or the environment.

Plaintiff's other contention, that the Ordinance's enforcement provisions as they pertain to the Site Registration requirement are unduly broad, is partly well-taken. The wording of the enforcement

provisions is not a model of clarity. For instance, one section cryptically calls for "local registration, inspection and enforcement by PA DEP." (Ordinance, § 1.1(D).) Another section provides that the Township itself may enforce DEP regulations. (Ordinance, § 6(D).)

■ It is difficult to determine exactly what was intended by these provisions. Nonetheless, despite plaintiff's suggestion that these provisions illustrate defendant's intent to usurp the DEP's enforcement authority, we take these provisions to mean that defendant will aid the DEP in its enforcement of SWMA and the regulations promulgated thereunder. Such a reading is consistent with SWMA and DEP regulations. For instance, DEP regulations provide that the DEP may inspect sites and take enforcement action based upon information provided by a person or a municipality. *See, e.g.,* 25 Pa.Code §§ 271.421(e), .851(a). The Ordinance also provides, for example, that defendant will inform the DEP if a soil analysis yields results outside the ranges permitted by federal and state law. (*See* Ordinance, § 5.1.1(C).) Far from being inconsistent with SWMA and DEP regulations, these local monitoring efforts are consistent with one of SWMA's goals—intergovernmental cooperation between state and local authorities. *See* 53 P.S. § 6018.102(1). If all local monitoring were preempted by SWMA and DEP regulations, then localities would be unable to execute their roles as local partners in monitoring waste management facilities.

Plaintiff also argues that the Ordinance is an impermissible power grab by defendant, insofar as the Ordinance purports to empower defendant to enforce DEP regulations. To the extent that plaintiff argues that only the DEP may enjoin operations, SWMA provides to the contrary. *See* 35 P.S. § 6018.604(b) ("In addition to any oth-

er remedies provided for in this act ... upon relation of the solicitor of any municipality affected, an action in equity may be brought in a court of competent jurisdiction for an injunction to restrain any and all violations of this act or the rules and regulations promulgated hereunder, or to restrain any public nuisance or detriment to health.") Moreover, to the extent that the Ordinance purports to provide for "local enforcement by PA DEP," (*see* Ordinance, § 1.(D)), we take this statement to mean merely that the defendant intends to execute its role as defined by SWMA and DEP regulations, not that the defendant intends to usurp the DEP's enforcement authority.

We pause, however, to clarify our ruling on the Ordinance's enforcement provisions as they pertain to the Site Registration requirement. Our understanding is that Site Registration is simply a written recognition that plaintiff has provided defendant with all relevant data, data which serve as baselines against which future test samples can be compared to ensure that plaintiff's operations are conducted within appropriate federal and state parameters.

■ Thus, we read the Ordinance to mean that, so long as one such as plaintiff provides defendant with all of the prerequisites listed in §§ 5.1.1(A)-(I), a Site Registration must be issued. If defendant, while conducting or reviewing the initial tests mandated in § 5.1.1, or the follow-up testing in § 7.3, discovers any deviation from state-mandated parameters, it may either inform the DEP or seek an injunction based on a violation of SWMA or DEP regulations. Defendant may not, however, refuse to issue a Site Registration or invalidate an existing Site Registration based on test results that deviate from, and therefore violate, DEP regulations. To the extent that the Ordinance's enforcement provisions purport to authorize, or

can be construed as authorizing, defendant to refuse to issue, to suspend, or to revoke a Site Registration based on a violation of DEP regulations that have been incorporated into the Ordinance, any such authorization is preempted by SWMA and the pertinent DEP regulations.

Accordingly, even if plaintiff is not in compliance with DEP regulations, plaintiff's operations can only be halted by defendant's either informing the DEP, which in turn may take appropriate action on its own, or seeking an injunction based on a violation of SWMA or DEP regulations, *see* 35 P.S. § 6018.604. The defendant may not halt plaintiff's operations by suspending or revoking a Site Registration on the ground that plaintiff is not in compliance with the Ordinance.

Essentially, we find that defendant cannot contort a violation of state regulations into a violation of a municipal ordinance by incorporating the DEP regulations into the Ordinance. In the event that plaintiff becomes noncompliant with DEP regulations, defendant can inform the DEP or initiate an action in equity as described in 35 P.S. § 6018.604. Regardless of the action taken by defendant, plaintiff's underlying noncompliance would be a matter of state law, not a matter of municipal law.

■■■■ As we come to the end of our preemption analysis, we recognize that our ruling effectively invalidates more than half of the Ordinance. Such a determination raises the question of whether the remainder of Ordinance may stand in light of such a ruling. We find that it may. Pennsylvania public policy favors the severability of state statutes. *See* 1 Pa.C.S.A. § 1925; *Commonwealth, Dep't of Educ. v. First School,* 471 Pa. 471, 370 A.2d 702, 706 (1977); *Indianapolis Power & Light Co. v. Pennsylvania Public Utility Comm'n,* 711 A.2d 1071, 1087 (Pa.Cmwlth. 1998). This policy is equally applicable to the severability of municipal ordinances. *See Hamilton v. Unionville–Chadds Ford Sch. Dist.,* 552 Pa. 245, 714 A.2d 1012, 1014 n. 2 (1998).

■■■■ Not only does Pennsylvania public policy favor severability, but the Ordinance contains a severability clause. This clause reveals defendant's intention that the Ordinance stand in the event that some of its provisions are stricken. Such clauses are, of course, not dispositive. *See Indianapolis Power & Light,* 711 A.2d at 1087. Nevertheless, the clause should be honored if allowing the unsevered provisions to stand will not destroy the unity of the Ordinance's general scheme. *See Pennsylvania R. Co. v. Schwartz,* 391 Pa. 619, 139 A.2d 525, 528 (1958). We believe that the Site Registration requirement is sufficiently distinct from the LAR requirement that the latter may be severed from the Ordinance without mutilating the Ordinance's intended purpose. *See Saulsbury v. Bethlehem Steel Co.,* 413 Pa. 316, 196 A.2d 664, 666 (1964). We will not, therefore, invalidate the entire Ordinance simply because some aspects of it are preempted.

### C. SFA

The state legislature enacted SFA "[t]o protect the public health, safety and welfare of its citizens through the development and implementation of plans for the sanitary disposal of sewage waste." 35 P.S. § 750.3. The Pennsylvania Supreme Court recognized in *Benham,* 523 A.2d at 314, that SFA does not preempt municipal regulations, but instead expressly contemplates both state and municipal regulation as part of "a comprehensive regulatory scheme for sewage disposal." This places SFA in the first category of legislation described in *Mars.* Our inquiry then is

whether any of the Ordinance's provisions are inconsistent or in conflict with SFA.

In light of our finding that portions of the Ordinance are preempted by SWMA, we need not decide whether those same portions would be preempted by SFA. We also find that the remaining provisions of the Ordinance are not preempted by SFA, largely for the same reasons that we found these provisions not to be preempted by SWMA; to wit, the remainder of the Ordinance complements state regulations, which furthers the intergovernmental cooperation which both SFA and SWMA seek to foster. Accordingly, we decline to rule that the remainder of the Ordinance is preempted by SFA.

### CONCLUSION:

For the foregoing reasons, plaintiff's motion for partial summary judgment will be granted in part and denied in part. Defendant's cross-motion for partial summary judgment will be granted in part and denied in part as well.

### STATEMENT OF REMAINING ISSUES:

In the wake of this memorandum and order, the only remaining issues are whether the provisions of the Ordinance that are not preempted by SWMA run afoul of the Commerce Clause, U.S. Const. art. I, § 8 (Count IV), and whether the enactment of the Ordinance in the first instance was an ultra vires action (Count IX).

### ORDER

For the reasons set forth in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Plaintiff's motion for partial summary judgment (Rec.Doc. No. 16), is granted in part and denied in part. Defendant's cross-motion for partial summary

judgment (Rec Doc. No. 71) is also granted in part and denied in part.

2. Summary judgment is granted in favor of plaintiff on the preemption issues as follows:

a. All aspects of the Ordinance relating to the Land Application Registration (LAR) requirement, including the entire Amendment to the Ordinance, are preempted by SWMA and DEP regulations promulgated pursuant thereto.

b. The pH maintenance provision, § 1.3, is preempted by SWMA and DEP regulations promulgated pursuant thereto.

c. To the extent that the Ordinance's enforcement provisions purport to authorize, or can be construed as authorizing, defendant to refuse to issue, to suspend, or to revoke a Site Registration based on a violation of DEP regulations that have been incorporated into the Ordinance, any such authorization is preempted by SWMA and the pertinent DEP regulations.

d. The clerk is directed to defer entry of final judgment until there is a final disposition of the entire case.

3. Summary judgment is granted in favor of defendant on the preemption issues with respect to the remainder of the Ordinance. Other than the provisions found preempted by SWMA and DEP regulations, the remainder of the provisions are not preempted by NMA, SWMA, or SFA. The clerk is directed to defer entry of final judgment until there is a final disposition of the entire case.